# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| JOHN VASSAR, on behalf of himself and all others similarly situated, | ) ) ) | Case No: |
|  | ) | Jury Trial Demanded |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and NORTHWESTERN UNIVERSITY, | ) ) ) ) |  |
| Defendants. | ) ) |  |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................1

II. PARTIES .............................................................................................4

    A. Plaintiff ....................................................................................4

    B. Defendant .................................................................................6

III. JURISDICTION AND VENUE .........................................................7

IV. INJURY TO PLAINTIFF AND CLASS MEMBERS ........................8

    A. One of the Nation's Most Heavily-Recruited Freshmen, Johnnie Vassar Accepted Multi-Year Athletics Grant-In-Aid to Play NCAA Division I Men's Basketball at Northwestern University ...............................................................8

    B. Despite Favorable Public Comments Before and During His Freshman Season, Northwestern Runs Johnnie Off of the Basketball Program Through a Campaign of Harassment, Pressure, and Deception by Coaching Staff .................................10

    C. Northwestern Prohibits Johnnie Vassar from Participating in the Basketball Program and Places Him in the "Wildcat Internship Program," Transitioning Him from Star Basketball Player to a Landscaper/Janitor to Get Him to Give Up His Athletic Scholarship ..................................................................13

    D. In addition to Northwestern's Office of General Counsel's Efforts to Make Johnnie Go Away for Cash, Northwestern Doctors Johnnie's Internship Timecards and Accuses Him of Fraud in an Effort to Terminate His Athletic Scholarship ..................................................................16

V. RELEVANT MARKETS ....................................................................23

VI. THE NCAA AND MEMBER SCHOOLS UNLAWFULLY AGREED TO RESTRAIN TRADE OR COMMERCE THROUGH ANTICOMPETITIVE RESTRICTIONS ON DIVISION I BASKETBALL PLAYERS' ABILITY TO TRANSFER...........................28

VII. CLASS ALLEGATIONS .................................................................37

VIII. CAUSES OF ACTION ...................................................................40

    FIRST CAUSE OF ACTION (ASSERTED INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED).........................................40

    SECOND CAUSE OF ACTION (ASSERTED INDIVIDUALLY) ................................41

    THIRD CAUSE OF ACTION (ASSERTED INDIVIDUALLY)....................................42

    FOURTH CAUSE OF ACTION (ASSERTED INDIVIDUALLY) ................................43

PRAYER FOR RELIEF ............................................................................................................44

JURY TRIAL DEMANDED.....................................................................................................45

Plaintiff, JOHN VASSAR, by and through his attorneys, based on his individual experiences, the investigation of counsel, and upon information and belief, alleges as follows:

## I.   INTRODUCTION

1.     The NCAA and its member institutions operate pursuant to an agreed set of "Bylaws," some of which operate to restrict the freedom of student athletes in violation of antitrust law.  The restrictions at issue here involve an agreement between and among the NCAA and its member institutions to restrict the ability of an NCAA student athlete to freely transfer schools.  If a school does not grant permission to transfer that student athlete must sit out a year before he or she can play elsewhere with an athletic scholarship.  Sitting out a year decreases (or outright eliminates) the ability of athletes to transfer because many schools want athletes who can play immediately, and subjects the athlete to a year without an athletic scholarship or forces them to transfer to a lower level division.

2.     On the other hand, non student athletes, even those who can be stars in a given academic field, are free to transfer with a new scholarship without waiting a year.  Coaches are free to transfer and often do so to obtain lucrative new contracts at a new school without sitting out a year.  Only Division I basketball, football, and hockey players are restricted by the NCAA's bylaws.

3.     In a competitive market free of the NCAA's and its members' restraint, these athletes would be allowed to transfer without restriction, particularly where, as in this case, their current coach no longer wants their services and "runs them off."

4.     By May 5, 2016, Northwestern University finally secured its run-off of Plaintiff John "Johnnie" Vassar, a National Collegiate Athletic Association ("NCAA") men's basketball player that joined Northwestern starting with the 2014-15 academic year and basketball season.

- 1 -

In doing so, Northwestern freed up the guaranteed multi-year athletic scholarship that it provided to him as the sweetener to get him to join the school's academic and basketball programs.

5.      To secure Johnnie's athletic scholarship so that the school could provide it to another player given the Northwestern-agreed and NCAA-imposed 13-scholarship limit, Northwestern engaged in a shady, dirty, and underhanded pattern of behavior over the course of a year.  Among other things, Northwestern:

a.  Berated the nationally-recruited, skilled basketball player, telling him, via the team's head coach, Chris Collins, that he "sucked" at basketball and had no future with the team,

b.  Called him in to the athletics offices under the guise that he was to pick up a request to contact form (a preliminary step to starting the transfer process) but instead pressured him to sign a blank "Roster Deletion" form by which Johnnie would be "voluntarily withdrawing (quitting)" the team,

c.  Put him in an "internship" under which he worked as a janitor instead of permitting him to train and play with his teammates,

d.  Asked about Johnnie's willingness to accept a cash payment to go away,

e.  Told Johnnie that his attorney had signed off on a Northwestern-proposed effort to resolve Johnnie's objections about Northwestern's actions when no such sign off had occurred and then denied the conversation even happened, and

f.  Falsified "internship" timecards in an attempt to create misconduct by Johnnie as a ground for taking away the athletic scholarship.

6.     Northwestern's machinations toward Johnnie Vassar provide the backdrop for a real need to remedy an illegal problem:  even if Johnnie gave into the school's campaign of verbal abuse and pressure and agreed to transfer schools (though he did not want to transfer from Northwestern), he could not because of the NCAA's anticompetitive rules that bar players like Johnnie from transferring schools without sitting out of play.   Johnnie reached out to multiple Division I basketball programs and received uniform responses:  they would bring Johnnie onto their program if he could play right away.  But because Johnnie could not play right away due to the anticompetitive rules, the schools passed on their interest.  Now, instead of playing Division I basketball and pursuing his dream of playing professional basketball after graduation, Johnnie is not a member of any Division I basketball team (even though he is still eligible to play), he no longer has an athletic scholarship (and has lost its associated monetary and non-monetary benefits), and he is forced to train on his own in an effort to keep up his skills honed through years of competitive basketball.  All the while, the shot clock on Johnnie's limited eligibility window ticks down.

7.     Accordingly, this suit challenges the NCAA rules that prevent Division I basketball players from transferring to other NCAA Division I schools and (1) playing immediately (2) without losing athletic eligibility for a year.

8.     The NCAA's limitation on the mobility of college athletes is patently unlawful. For a striking contrast, one can simply examine the unfettered mobility of the players' coaches. Basketball coaches, including assistant coaches, are free to leave a school at any time they choose to take another job in the college or professional basketball ranks.  This ability to better their own situation has allowed coaches to reap enormous financial benefits.  Indeed, at least 37

- 3 -

men's Division I basketball coaches earn more than $1 million per year, even prior to the

calculation of lavish performance bonuses.[1]

9.      Players, however, suffer a severe penalty for transferring – the loss of a year of

athletics eligibility.  This can make them a very unattractive option for coaches who are under

constant "win now" pressure.  The NCAA's transfer rules restrain players' ability to make the

best choices for themselves, including ones based on financial considerations, academics

considerations, athletics considerations, and personal circumstances.  The NCAA's transfer rules

are anticompetitive and violate the Sherman Act.  The transfer restrictions have been widely

condemned, as Joe Nocera observed in the New York Times:

> But it is more than just the hypocrisy. The transfer rule exemplifies
> the way the N.C.A.A. and the college sports establishment strip
> athletes of rights that our country's laws guarantee not only to
> other college students, but to all Americans. There are few
> N.C.A.A. rules that are as blatantly unfair.[2]

## II.      PARTIES

**A.      Plaintiff**

10.      Plaintiff John Vassar ("Johnnie") is a citizen of the United States and resident of

Illinois.  A skilled and gifted basketball player, Johnnie was recruited by numerous colleges out

of high school and offered grants-in-aid (also known as athletic scholarships) by numerous

NCAA Division I men's basketball schools.  In 2014, Johnnie joined Northwestern University, a

Division I school in Evanston, Illinois, on a full multi-year basketball grant-in-aid that

guaranteed him a scholarship during the entire period of his eligibility.

---

[1] http://sports.usatoday.com/ncaa/salaries/mens-basketball/coach (last visited November 10, 2016).

[2] http://www.nytimes.com/2016/04/02/sports/ncaabasketball/with-college-transfer-rules-hypocrisy-never-sits-out-a-year.html?_r=0 (last visited November 10, 2016).

- 4 -

11.     In 2015, Johnnie was informed by Northwestern University that he would no longer have a spot on the basketball team due to no fault of Johnnie.  By 2016, he was informed that his basketball grant-in-aid would be converted to an *academic* scholarship in order to release him as a "counter."  Following relentless efforts by Northwestern, and though Johnnie wanted to stay at Northwestern, Johnnie looked into transferring and received interest from several Division I schools who would have extended offers to him if he was immediately eligible.  But because he was unable to secure a waiver of the NCAA transfer rules pursuant to which he would be forced to sit out of competition for a year, all of the schools rejected him or lost interest.

12.     After Northwestern cut Johnnie from the basketball team, the school converted his athletic scholarship into an academic scholarship.  However, Johnnie's academic aid is less than the athletics grant-in-aid.  For example, as a member of the basketball program at Northwestern, Johnnie had to satisfy a mandatory summer school attendance obligation.  But without his athletics grant-in-aid, Johnnie could not afford to pay the $6,832 dollars for summer school in 2015 and/or 2016 that he would have received as a basketball student-athlete with his athletics grant-in-aid.[3]  Moreover, Johnnie has lost other valuable items as a result of losing his athletic scholarship as he is no longer eligible to register for his classes before other students, he cannot receive medical and health services from Northwestern's sports medicine staff, and he cannot use Northwestern's training facilities or receive cost-free athletic training to maintain his basketball skills.  As a direct result, Johnnie has paid more money and suffered an ascertainable loss than he would have in the absence of the NCAA's transfer rules.

---

[3] As an athlete with an athletics grant-in-aid, Johnnie was expected to attend summer school. While Johnnie asked Northwestern if he could go to summer school (as he did previously) so that he could graduate in three years and still have two years of NCAA eligibility, Northwestern said that it would not pay for summer school.

**B.     Defendant**

13.     Defendant NCAA is an unincorporated association that acts as the governing body of college sports.  Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports.  The NCAA Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions.  Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its members and between members of the NCAA.

14.     As of September 2015, the NCAA includes 1,102 active member schools, organized into three Divisions.[4]  Division I includes 348 schools, including 345 with basketball programs.  Divisions II and III include schools with much less extensive or no basketball programs.

15.     As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college basketball must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.  There is no practical alternative to NCAA Division I membership for any academic institution that wishes to participate at the highest levels of basketball.  Indicative of the NCAA's market power, when the NCAA bans a university from participating in NCAA sponsored collegiate competition, this prohibition is colloquially known as the "death penalty."

16.     Because the NCAA and NCAA member institutions control the highest and most popular levels of college basketball, any individual who wishes to provide athletic services in

---

[4] http://www.ncaa.org/about/who-we-are/membership/composition-and-sport-sponsorship-ncaa-membership (last visited November 10, 2016).

- 6 -

exchange for the payment of *full* tuition for an undergraduate academic and athletic education must by necessity attend an NCAA Division I member institution. There are zero practical alternatives that can provide the unique combination of attributes offered by NCAA Division I basketball schools: (i) the ability to exchange athletics services for the payment of the full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, and (vi) competition at the highest level of amateur basketball.

17.     There is no major college basketball program in the United States that is not an NCAA Division I member, abiding by the NCAA rules. NCAA Division I member institutions are by far the largest purchasers of student athlete labor in the United States, and the NCAA and its Division I member institutions have monopsony power over the markets for student basketball players.

### III.    JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 15 and 29 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws.

19.     This Court has personal jurisdiction over Defendant NCAA because the NCAA transacts business in this district, including, but not limited to, sporting events. Furthermore, numerous NCAA member institutions and co-conspirators are located in this judicial district, including Defendant Northwestern University.

20.    This Court has personal jurisdiction over Defendant Northwestern University

because Northwestern University is located in and transacts business within this judicial district,

specifically Evanston, Illinois, including, but not limited to sporting events.

## IV.    INJURY TO PLAINTIFF AND CLASS MEMBERS

**A.    One of the Nation's Most Heavily-Recruited Freshmen, Johnnie Vassar Accepted Multi-Year Athletics Grant-In-Aid to Play NCAA Division I Men's Basketball at Northwestern University**

21.    Plaintiff Johnnie Vassar was a star high school point guard and one of the nation's

most heavily recruited players at the time of his ascension to NCAA athletics.  High school

sports commentators highly praised Johnnie's basketball skills, praising his ability as a

sharpshooter from long and short range, court awareness, significant vertical jumping capability,

moves in changing speed and direction, and fearlessness staying one step ahead of defenders to

make a basket or set his teammates up for one.

22.    As a result, Johnnie drew recruiting interest and/or scholarship offers from many

prominent Division I basketball programs, including University of Illinois, DePaul University,

University of Georgia, University of California Berkeley, University of California Los Angeles,

Syracuse University, University of Southern California, Southern Methodist University,

University of Tennessee, University of Texas (El Paso), University of Washington, University of

West Virginia, Villanova University and Northwestern University.

23.    Ultimately, Northwestern coaches and players influenced Johnnie to turn down

other offers in order to be close to his home in Chicago.

24.    On April 10, 2014 (via Aaron Hosman, Northwestern's Assistant Athletics

Director for Compliance), Northwestern University (and its men's basketball head coach, Chris

- 8 -

Collins) offered Johnnie a multi-year full grant-in-aid in order for Johnnie to attend Northwestern University over the period 2014-15 through 2017-18 academic years.

25.     Johnnie came to Northwestern from a family of limited economic means and was the first adult male in his family not simply to attend college, but also to avoid incarceration, a testament not only to Johnnie's athletic and academic skills but also to the support he received from his mother, Cherise Vassar.

26.     Thus, Johnnie proudly accepted Northwestern's offer, pursuing his goals to achieve a stellar education while fulfilling his dream of playing Division I basketball at a major conference.

27.     Northwestern recruited Johnnie on the ground that he would be treated holistically and as a true student-athlete, not having to choose being a "jock" over a student, or student over a "jock."

28.     Johnnie joined the Northwestern basketball team following Northwestern's run-off of another player from the team in order to open up a scholarship spot on its roster.  As reported by the Chicago Tribune on September 15, 2013, student-athlete "Mike Turner will take what Northwestern officials are calling a 'leave of absence' from the Wildcats' basketball program," with Turner "not play[ing] for the Wildcats this season and he's unlikely to rejoin the team after not meshing with the new coaching staff, according to sources."  The article noted that "Turner's departure opens up a scholarship slot that likely will not be filled until next season."

- 9 -

B.     **Despite Favorable Public Comments Before and During His Freshman Season, Northwestern Runs Johnnie Off of the Basketball Program Through a Campaign of Harassment, Pressure, and Deception by Coaching Staff**

29.     Johnnie participated on Northwestern's team as a freshman during the 2014-15 basketball season.  Vassar played sparingly as a freshman, scoring 15 points while appearing in 18 games, primarily at the end of halves as a defensive specialist.

30.     As Coach Collins described Johnnie's abilities in November 2014: "'He's still learning since he's a young player, so he's going to make some mistakes,' Collins said. 'But he can do things that nobody else on our team can do.'"  Collins added that Johnnie brought "a new dimension to our team with his speed, quickness and explosiveness," describing Johnnie as "a guy who can change the pace of a game."[5]  Similarly, Northwestern basketball commentators noted how "Vassar seems like just the type of player who can help his school finally climb out of its 75-year 'abyss.'"[6]

31.     Despite Johnnie's innate basketball skill and such public comments, following the 2014-15 basketball season, Johnnie was strongly and repeatedly urged by Northwestern's basketball coaching staff to transfer to another school so that the team would have a scholarship to offer to another specific player that the team coveted.

32.     On or about February 3, 2015, after a game, head coach Chris Collins publicly berated Johnnie in the locker room, stating that Johnnie "sucked" at basketball, had a bad attitude, didn't do 'shit' when Johnnie was in the game, and should expect not to play anymore. Several of Johnnie's teammates approached him afterwards and told him that Coach Collins' statements were completed uncalled for.

---

[5] http://www.northbynorthwestern.com/story/johnnies-journey/ (last visited November 10, 2016).

[6] http://www.northbynorthwestern.com/story/johnnies-journey/

33.    In or about March 2015, Northwestern's coaching staff—namely Coaches Collins, Gates and Humphrey— made at least 16 phone calls and sent numerous text messages, urging Johnnie to transfer to another school to play basketball.  Understandably, Johnnie was shocked by the coaches' desire to run him off the team, which contradicted everything he had been told in the recruiting process.

34.    At the same time Northwestern's coaching staff contacted Johnnie, they were working on another front as well:  his mother, Cherise Vassar.  The coaching staff continually called Mrs. Vassar to discuss Johnnie transferring, despite her request that they contact her at a later date because she was combating a serious medical issue.  Mrs. Vassar informed the Northwestern coaching staff of her health ailments, but they continued to pressure her and Johnnie to discuss transferring.  In fact, during one call at that time with Johnnie, Cherise Vassar and Coach Gates, Cherise Vassar conveyed to Coach Gates that that Johnnie did not want to transfer.  In response to her statement that it sounded like Northwestern was forcing Johnnie out of the program, Coach Gates responded along the lines that while Coach Collins wouldn't say they were forcing Johnnie out, Gates confirmed they were in fact forcing him off of the team.

35.    Notwithstanding the coaching staff's propositions, Johnnie determined that it was not in his best interests to consider leaving the team or Northwestern, particularly without having any commitment to him from another school.  So the coaching staff repeatedly urged him to pick up a "permission to contact" form[7] that would allow other schools to contact him.  Then, when Johnnie agreed to pick up a "permission to contact" form as requested of him, Northwestern used that as an opportunity to remove him from the team and effectively released Johnnie, in violation

---

[7] According to the NCAA's website, if a NCAA chooses to transfer, the athlete's current athletic director must give the athlete written permission to contact another school.

of NCAA Division I Bylaw 15.3.5.1(d), which directs that a "student-athlete's request for written permission to contact another four-year collegiate institution regarding a possible transfer does not constitute a voluntary withdrawal."

36.     Northwestern's athletic department members used the permission to contact as an opportunity to delete him from the basketball roster.  Afterwards they continued to harass Johnnie to come in and sign a blank roster deletion form, which a was accompanied by a handwritten post-it note from Ryan Humphrey, Director of Player Development:

> JV,
> Sign this paper.
> You can still work out
> and play pickup with
> the guys.  I told you
> before I am still here for you – Hump.

37.     Northwestern's Roster Deletion form acknowledged that student-athletes leaving the basketball program would lose a variety of benefits, including loss of issued equipment, no further treatment or evaluation from the Sports Medicine Staff (unless the athlete was recovering from a current athletically related injury), loss of access to the Athletics Weight Room Facilities, and loss of services from Academic Services (unless otherwise agreed upon).

38.     On or about March 30, 2015, Northwestern then informed the media that Johnnie was transferring and issued a press release to that effect.  However, Johnnie never signed any documents to transfer, and the release sparked an onset of comments and articles about Johnnie's status as a player at Northwestern.

39.     For example, in reporting by Henry Bushnell on Inside NU, Bushnell wrote "Vassar's departure opens up another scholarship that Chris Collins may use on another class of

- 12 -

2015 player," with the thought that "the extra scholarship could be used on Kipper Nichols, a 6-foot-6 three-star class of 2015 wing from Ohio."

40.     Further evidence supporting the fact that Johnnie had not sought a release comes from Northwestern's 2014-15 athletics manual which circumscribes a student-athlete's ability to contact another school about a possible transfer.  First, while the student-athlete must first meet with his head coach, no meeting between Johnnie and Coach Collins regarding transfer occurred; instead, Johnnie and his mother were called by Coach Collins to convince Johnnie to sign the written release.  Second, the student-athlete must make a formal request in writing via email to the head coach.  But Johnnie never requested in writing a permission to contact form; rather, coaches initiated this process, harassing him by phone and text to come in for the release.  Third, if permission is granted, the student-athlete must meet with the Associate Athletics Director for Compliance to discuss the academics and athletics eligibility regulations for transfers.  With Johnnie, no such meeting occurred.

41.     Forced to consider transferring, in the spring of 2015, Johnnie communicated with representatives from multiple other Division I basketball programs, including DePaul University, Georgia Tech, University of Utah, and University of Nevada Las Vegas.  The schools were uniform in their responses: if Johnnie could play right away, they had a spot for him on their team.  But because of the NCAA's eligibility rules, Johnnie could not play right away.

**C.     Northwestern Prohibits Johnnie Vassar from Participating in the Basketball Program and Places Him in the "Wildcat Internship Program," Transitioning Him from Star Basketball Player to a Landscaper/Janitor to Get Him to Give Up His Athletic Scholarship**

42.     Because Johnnie continued to make it clear to Northwestern that he was not withdrawing from the team or the school, and was not transferring without any concrete options in place, Northwestern realized that its position that Johnnie had withdrawn was untenable, and

- 13 -

placed him in an on-campus "internship" in the "Wildcat Internship Program" as a means by which he could retain his athletic scholarship.[8]

43.     By July 1, 2015, in a letter by Brian Baptiste, Associate Athletics Director for Compliance, and in accordance with NCAA Bylaw 13.1.1.3, Northwestern granted "permission to contact Men's Basketball student-athlete, **Johnnie Vassar**, regarding his possible transfer to any institution to compete in the sport of **Men's Basketball**, except for" other Big Ten Conference institutions.  On that same day, Johnnie signed a document regarding "Non-Participant Scholarship Status," setting forth various obligations for Johnnie to maintain his athletics scholarship while not continuing as a member of the basketball team, including an eight-hour-per-week service requirement in the athletics department.

44.     Even though Johnnie would not be allowed to participate on the team, pursuant to NCAA rules, he would still count against Northwestern's maximum number of allowable basketball grants-in-aid.

45.     As a result, Northwestern's coaching staff upped their efforts to free up Johnnie's scholarship for another player and run off Johnnie.

46.     Under the terms of his "internship" under the "Wildcat Internship Program," a program ordinarily related to Northwestern athletics, Northwestern directed Johnnie to report by

---

[8] Subsequently, on April 8, 2016, Northwestern's Vice President and General Counsel, Phillip Harris, conveyed that when Northwestern and Johnnie entered into the agreement whereby Johnnie would serve as an intern, the school believed that Johnnie would be transferring soon.  Had the school not believed that Johnnie would be transferring soon, it would have revoked Johnnie's athletics scholarship at that time.

7:00 a.m. several days per week and perform janitorial and maintenance duties outside the athletic facilities for two or three hours depending on the day.[9]

47.     Instead of participating in the basketball program, or participating in an internship that provided higher education or professional/career development, Northwestern focused Johnnie on menial tasks:  Johnnie picked up trash and leaves, operated a leaf blower, put salt on sidewalks and under cars, wiped down the outside tennis court bleachers, swept the baseball diamonds, and lift heavy metal planks near the football field (hurting his shoulder).  Teammates and other students often walked by Johnnie, inquiring why he was picking up trash or working in the snow.

48.     Johnnie repeatedly sought assistance from various members of Northwestern's staff, including Vice President for Athletics and Recreation Jim Phillips, Deputy Director of Athletics (External Affairs) Mike Polisky, Deputy Director of Athletics (Internal Affairs) Steve Green, and Academic Advisor Cory Harbor regarding his concerns about his treatment, all to no avail.

49.     On or about November 14, 2015, Mr. Harbor informed Johnnie that other positions were open, but that Mr. Polisky had instructed Mr. Harbor not to authorize a change of position for Johnnie.

---

[9] The "internship" terms also required Johnnie to drive a significant distance to report for work at that early hour, as he was then assisting caring for a family member at home with special medical needs.  Johnnie, in the course of being assigned an internship, had gone through the normal process of indicating areas of interest, and also indicated his family's medical situation. Northwestern disregarded all of this information.

**D.    In addition to Northwestern's Office of General Counsel's Efforts to Make Johnnie Go Away for Cash,  Northwestern Doctors Johnnie's Internship Timecards and Accuses Him of Fraud in an Effort to Terminate His Athletic Scholarship**

50.     Given his dealings with Northwestern, by January 2016, Johnnie's lawyers were contacting Northwestern on Johnnie's behalf in order to alleviate the stress and pressure created by the university.

51.     By March 9, 2016, Northwestern had resorted to consideration of a cash payment to make Johnnie go away and free up his scholarship.  Thus, Northwestern's Deputy General Counsel, Priya Harjani, informally inquired into Johnnie's openness to considering a cash payment equivalent to the remaining value of his athletics scholarship.

52.     However, Johnnie rejected such a notion out of concern that such a payment would violate NCAA rules, end his ability to play NCAA basketball, and result in the loss of other valuable attributes of his athletics scholarship, such as access to academic support services for athletes.

53.     On March 16, 2016, Northwestern's Office of General Counsel continued the school's efforts to make Johnnie leave.  Again through counsel Priya Harjani, Northwestern indicated its desire to "move Johnnie over to a merit based scholarship" for Johnnie to be "covered financially the exact same way he currently is."  And "[a]s a result of him no longer being an Athletic scholarship, his [sic] will no longer have to perform the 8 hours of work for the Athletics department."  Northwestern declared "Johnnie can still transfer should the right opportunity present itself" and presented the proposal as time sensitive, requesting a response the next day.  However, at the time, Johnnie was dealing with the death of his father, adding to the significant stress Johnnie faced as a result of Northwestern's efforts to run him off and take away his athletics scholarship.

54.    By April 8, 2016, Priya Harjani, Deputy General Counsel, wrote to let Johnnie

know "that Athletics has decided to revoke Johnnie's athletic scholarship and will likely do so

next week" and on April 9, 2016, stated the rationale for Northwestern's decision as follows:

> Johnnie indicated he wanted to transfer. He sent out a tweet[10]
> announcing that he was leaving Northwestern and gave approval to
> our athletic communications department to distribute a release
> detailing the same information.[11] However, he has not yet
> transferred and Northwestern has continued to honor its
> commitment to him by keeping him on a full scholarship.
>
> Should he not transfer, Northwestern is still offering to honor its
> commitment to Johnnie by keeping him on a full scholarship for an
> additional two years. He will be made whole by receiving the
> same amount of aid. The agreement that I previously sent to you
> outlines the terms of the non-athletic scholarship. If he signs the
> agreement, that is the assurance that you are seeking that he will
> continue to receive the funds.
>
> Northwestern has the ability to revoke his athletic scholarship
> should he not sign the agreement and plans to do so. Per your
> previous request, we have sent you the Big 10 Conference and
> NCAA interpretations indicating this does not harm Johnnie's
> ability to transfer and is not a violation of NCAA rules. I can
> assure you that the senior leadership at Northwestern is aware of
> this situation.
>
> We hope that the matter can be resolved but Northwestern plans to
> move ahead as previously stated.

55.    On April 14, 2016, Northwestern laid out two options:

---

[10] On March 30, 2015, Johnnie tweeted: "I've loved my time at Northwestern University but
have arrived at the very difficult point of transferring. This was incredibly challenging to
announce since I will miss my team, our coaching staff, and the stellar academics NU offers. Yet
I know this transition is best for me as I look forward to attending a school where I can play a
more integral role on the court while I continue to excel in my studies. NU has helped me grow
tremendously as a student and athlete. I know these lessons will help me advance wherever I
land next. Thank you again to Coach Collins, NU's Coaching Staff, and team for this
opportunity. It's been a great year as a Wildcat. I've enjoyed all the memories and time spent
here!" http://www.insidenu.com/2015/3/30/8286677/johnnie-vassar-to-transfer-from-
northwestern (last visited November 10, 2016).

[11] Johnnie did not approve of the press release.

1) Northwestern revokes Johnnie's scholarship. Under this scenario, we would not be able to offer Johnnie a full non-athletic scholarship because as you indicate, this may implicate NCAA rules. If Northwestern takes this approach, Johnnie would have the ability to appeal the decision through an internal appeals process. If he does not prevail, he would need to apply for financial aid through the normal process.

2) Johnnie signs the agreement which states he is voluntarily relinquishing his athletic scholarship. Under this approach, we have a private settlement agreement and would offer him a non-athletic scholarship. This would be a binding, legal agreement that would guarantee the aid for his final two years. We are open to discussing the language in this agreement if there is a provision of the confidentiality agreement that Johnnie is not comfortable with currently. As you know, the NCAA and Big 10 interpretations we sought regarding this option stated there are no issues for either Johnnie or Northwestern to proceed in this manner.

56.     With respect to Option # 2, on April 20, 2016, Johnnie received a call from Mike Polisky, Northwestern's Deputy Director of Athletics (External Affairs). During the call, Mr. Polisky said that Johnnie's counsel had approved the form of Northwestern's proposed settlement agreement to resolve the scholarship issue, urging Johnnie to sign the agreement. When Johnnie refused, Mr. Polisky repeated that Johnnie's counsel had approved the agreement and there was no reason for Johnnie to refuse. In fact, Johnnie's counsel had not approved the agreement.

57.     On or about April 20, 2016, after a formal recommendation from Northwestern's Department of Athletics and Recreation, Northwestern cancelled Johnnie's athletic scholarship as noted in a letter from Carolyn Lindley, University Director of Financial Aid, effective at the end of the Spring quarter of 2016.[12]

---

[12] The April 20, 2016 correspondence cc'd a number of Northwestern financial aid administrators, including Patricia Telles-Irvin (Vice President for Student Affairs), Robert Gundlach (Director, WCAS Writing Program), Janna Blais (Deputy Director of Athletics (Student-Athlete Welfare)), and Jim Phillips (Vice President for Athletics and Recreation).

58.     The stated basis for the cancellation was "as a result of [Vassar's] noncompliance with the terms outlined in the nonparticipant agreement [he] signed on July 1, 2015."  The letter, sent pursuant to NCAA Bylaw 15.3.2.3, provided Vassar with a 48-hour window to provide notice of his intent to appeal.  The letter concluded by noting that "should [Vassar] continue to remain enrolled as a student in good standing at Northwestern University for the 2016-17 and 2017-18 academic years, the University has agreed to administer a scholarship covering [his] full cost of attendance."

59.     When Johnnie inquired regarding the factual basis for the revocation, Mr. Polisky stated that Northwestern would provide information to Johnnie regarding some type of administrative hearing process.  When Johnnie asked what the grounds were for revocation, Mr. Polisky informed Johnnie that there are grounds, and that it is more than just Johnnie not participating on the team, but he would not tell Johnnie the grounds.[13]

60.     While the April 20, 2016 letter from Ms. Lindley provided Johnnie with no information regarding what noncompliance occurred, after repeated requests, Northwestern's Deputy General Counsel, Priya Harjani, declared on April 22, 2016, that "[t]he July 2015 contract was breached because Johnnie regularly worked fewer than the agreed-upon weekly hours (8) and, subsequently, submitted fraudulent reports to the athletic department."   Thus, blatantly accusing Johnnie of fraud, she added that "[t]he hours worked are calculated directly from Johnnie's personal timecards, of which he is solely responsible."  Northwestern, via Harjani, then presented Vassar with two options: (1) not appeal in order to guarantee a non-athletic scholarship and a purported commitment to provide him the tutoring he was receiving

---

[13] Northwestern admitted on April 20, 2016, that Johnnie's call with Mike Polisky occurred, but disputed the content of the call.

through the Athletics Department without any work obligations or (2) appeal and take "a risk of losing all scholarship possibilities" such that "[i]f Johnnie wins the appeal, he keeps the scholarship" but that if he "loses the appeal, Johnnie may have no scholarship at all and will have to fund his last two years at Northwestern on his own."

61.     Because Johnnie was certain he had never forged any timecards or otherwise engaged in misconduct, he rejected Northwestern's proposal. On April 22, 2016, Johnnie provided his notice to Northwestern that he would be appealing the revocation of his athletics scholarship.  By April 25, 2016, Carolyn Lindley confirmed receipt of Johnnie's notice and provided additional information about the appeal process.  Ms. Lindley noted:

> The appeal process starts by the Chair asking that the student and the Athletic Department representative write a brief statement reflecting their statement of position.  I will share the Athletic Department statement with you and yours with them.  The three members of the Appeals Committee will also receive the statements.  In addition to the statements, you will be asked to have an in person conversation with the committee.  These meetings usually take around an hour. Representatives of the Athletic Department will also be asked to meet with the Committee. You will not be present at theirs, and they will not be at yours. Sometimes these meetings take place on different days.  The Committee will have questions based upon the statements in addition to what may come up during the meeting.  You may bring a family member, friend or faculty advisor with you, but not an attorney.

62.     Around that time, on April 26, 2016, Johnnie began efforts to investigate the fraudulent timecard issue.  That day, Johnnie spoke with Scott Arey, Associate Athletic Director (Facilities), and asked for copies of his timecards.  Mr. Arey asked Johnnie to come back in an hour.  When Johnnie returned later in the day, he was informed that Mr. Arey was in a meeting, and a woman in the office named Amy Loch said she would text Mr. Arey to see if he was available or where Johnnie's records were.  Then, Ms. Loch went into Mr. Arey's office and

returned with copies of timecards and some paper. After Ms. Loch gave the materials to Johnnie, she received a text and then said "they will give it to your attorneys." Johnnie asked if he could take a picture of the documents, and Ms. Loch said she would check. After more texting, she said "no, they will give it to your attorneys." Johnnie then handed the records back to Ms. Loch, thanked her, and left.

63.     On April 26, 2016, Northwestern convened Johnnie's appeal. In supporting its position that Johnnie submitted fraudulent timecards, Northwestern submitted what it purported to be Johnnie's timecards, even though it was clear the timecards were from someone else whose name was crossed out or even misspelled Johnnie's name. As submitted by Northwestern:



64.     The timecards were not Johnnie's timecards, even though "Johnnie Vassar" or "Johnnie V" were handwritten on the timecards. In fact, the bush-league forgery effort to tag

- 21 -

Johnnie with misconduct to gain access to his scholarship suffered from numerous signs of forgery: the timecards were not in Johnnie's handwriting, they did not follow Johnnie's personal protocol for writing his name on official documents such as timecards (as reflected by the use of the informal "Johnnie" when he would have written "John"), one timecard reflecting clocking-in and clocking-out times on days when Johnnie was out of the state with proof of travel (March 26-28), and another misspelled his name.

65.     Johnnie "won" his appeal. Accordingly, on May 4, 2016, Northwestern's Athletic Aid Appeals Committee, via Carolyn Lindley (University Aid Director) announced the completion of its review of Johnnie's appeal. The Committee concluded that "the Department of Athletics and Recreation has not provided sufficient information for a removal of your athletics scholarship." Nevertheless, "the Committee is choosing to administer the granting of the aid in a different manner than usual due to the unusual circumstances presented in this appeal." In doing so, the Committee recognized that Johnnie "had not come to Northwestern with the expectation that you would be doing maintenance work" and confirmed "that it was very awkward for [Johnnie] to be at work while other student athletes were coming for practice." But the Committee announced that it was taking "away this obstacle" by removing Johnnie's athletic scholarship and providing him "the equivalent scholarship from the general Northwestern Scholarship account in the same amount as you would have received as a student athlete."

66.     Thus, by May 5, 2016, Northwestern finally freed up Johnnie's athletic scholarship and he no longer counted toward the school's NCAA scholarship caps.

67.     However, Johnnie's athletic scholarship was more valuable than the academic scholarship, providing Johnnie with summer school, early registration as well as access to facilities, athletic training, medical care, academic advising, and tutoring. Indeed, without his

- 22 -

athletic scholarship, Johnnie paid for gym time and personal trainers/therapists (such as paying approximately $2,500 per week for three weeks during the summer of 2016) which would not have been needed if he was on an athletic scholarship.

68.     In a competitive market, Plaintiff would have been able to transfer without limitation and, as a result, would have had several Division I full grant-in-aid offers from which to choose.  The NCAA's artificial and anticompetitive anti-transfer rules, pursuant to which a Division I basketball player must sit out of competition on his eligibility clock unless he fulfills the very narrow and stringent requirements for a hardship waiver, has injured thousands of student-athletes by causing them to either lose an opportunity to transfer schools or give up a year of play.  Division I basketball players who have lost grants-in-aid at their current schools are further faced with the decision to transfer to a Division I school where they are unlikely to receive full grants-in-aid, if any aid at all, or transfer to a less competitive Division II school.

## V.     RELEVANT MARKETS

69.     The relevant markets are the nationwide markets for the labor of Division I basketball student athletes.  In this labor market, student-athletes compete for spots on Division I basketball athletic teams of NCAA member institutions, and NCAA member institutions compete for the best Division I basketball collegiate student athletes by paying in-kind benefits, namely, Division I basketball grants-in-aid, academic programs, access to training facilities, and instruction from premier coaches.

70.     Unlike Division I football, NCAA Division I basketball and baseball are not further divided into subdivisions.  Division I basketball programs compete at the highest level of college sports.  They generate billions of dollars in revenue from attendance fees, TV contracts, sponsorship, and alumni contributions.  In fact, most of the NCAA's revenue (81 percent

- 23 -

projected for 2012-13) comes from media rights, which in turn comes "mostly from a $10.8 billion, 14-year agreement with CBS Sports and Turner Broadcasting for rights to the Division I Men's Basketball Championship."[14]

71.    The superior revenues generated by Division I basketball programs enable the Division I schools to provide superior coaching, playing and training facilities, and travel opportunities to players.

72.    NCAA Division II basketball programs are not in the same market as Division I basketball programs.

73.    Division II basketball programs have smaller budgets, play close to home, and do not generate excess revenue for the school as a whole.  Compared to Division I, it costs Division II schools about half as much to sponsor a competitive athletics program as it does in Division I.[15]  And Division II programs also rely on a partial-scholarship model to administer athletics-based financial aid such that very few of the student athletes competing in Division II will receive full athletics-based grants that cover all of their expenses.[16]

74.    Furthermore, the number of scholarships available in Division II is lower than in Division I.  The total number of Division II basketball scholarships is limited to 10, whereas Division I basketball programs can award 13 scholarships.  A typical NCAA Division I college basketball squad numbers 16 players while Division II programs average 17 players.[17]  So, few Division II basketball athletes are awarded a full scholarship.

---

[14] http://www.ncaa.org/about/resources/finances/revenue (last visited November 10, 2016).

[15] http://www.ncaa.org/about/division-ii-partial-scholarship-model (last visited November 10, 2016).

[16] *Id.*

[17] http://www.scholarshipstats.com/basketball.htm (last visited November 10, 2016).

75.     NCAA Division III basketball programs are prohibited from awarding athletic scholarships so they are not in the relevant market.

76.     The National Association of Intercollegiate Athletics ("NAIA") is the only other sizable association sponsoring four-year college basketball and is made up of smaller schools and small athletics programs.

77.     NAIA rules permit only 11 basketball scholarships in NAIA Division I and only 6 basketball scholarships in NAIA Division II.  So, few student-athletes receive a full scholarship to play basketball.  NAIA basketball programs are also not in the relevant market.

78.     Two-year junior colleges cannot award college degrees.  Superior high school basketball players do not choose to play at a junior college unless they are unable to meet NCAA academic eligibility standards.

79.     The differences between the NCAA divisions, and between the NCAA and the NAIA, are demonstrated by a variety of additional factors.

80.     Total revenue is probably the most critical factor in differentiating the markets.

81.     Total men's basketball revenue for the 347 NCAA Division I schools in 2014 was $1,502,141,591 (an average per school of $4,328,938), dwarfing the total men's basketball revenue for the 309 NCAA Division II schools of $150,737,357 (an average per school of $487,823).

82.     In 2014, basketball revenue for the 229 NAIA schools with men's basketball programs was $77,123,199 (an average per school of $336,782). [18]

83.     The large differences in revenue between Division I schools and NAIA and Division II schools are driven in part by the differences in total attendance.

---

[18] http://ope.ed.gov/athletics/#/customdata/datafiltered (last visited November 10, 2016).

- 25 -

84.     NCAA Division I basketball programs drive attendance as well.  For the 2014-15 season, 32,510,647 fans came to watch basketball games in Divisions I, II, and III.  However, of that larger number, NCAA Division I attendance drove the majority, totaling 27,422,615 for the year, far exceeding Division II and III attendance combined.  Individual game analyses reflect similar disparity in attendance as Division I basketball schools averaged 4,754 fans per home game while Division II basketball schools averaged only 686 fans per home game.[19]

85.     The differences between college basketball divisions in the quality of competition and the level of institutional support cause superior high school basketball players to choose Division I scholarships over Division II or NAIA scholarships.  For these players Division II and NAIA basketball is not a substitute for Division I basketball.

86.     The relevant market is illustrated by the experience of Plaintiff.  Johnnie was recruited by multiple Division I schools and chose Northwestern based on its offering of a multi-year scholarship and academic commitment to its athletes.  If, initially, he had been offered a full scholarship at a non-NCAA Division I program, he would not have accepted.

87.     The relevant geographic market is the United States.  All Division I basketball teams are located in the U.S.

88.     Despite the nonprofit status of NCAA member schools, the transactions those schools make with premier Division I basketball athletes – full scholarships in exchange for athletic services – are not noncommercial, since schools make millions of dollars annually as a result of these transactions.

---

[19] http://fs.ncaa.org/Docs/stats/m_basketball_RB/Reports/attend/2015.pdf (last visited November 10, 2016).

89.     Thus, the transactions between NCAA schools and student-athletes are, to some degree, commercial in nature, and therefore take place in a relevant market with respect to the Sherman Act.

90.     Given the competition for Division I basketball athletes, the only reason that NCAA Division I schools do not engage in price competition is because the Bylaws at issue prevent them from doing so.

91.     Colleges do, in fact, compete for student-athletes, though the price they pay involves in-kind benefits as opposed to cash.  For instance, colleges may compete to hire the coach that will be best able to launch players from the NCAA to the National Basketball Association or professional basketball, an attractive component for a prospective college basketball player.  Colleges also engage in veritable arms races to provide top-of-the-line training facilities which, in turn, are supposed to attract collegiate athletes.  Many future student-athletes, including Plaintiff, also look to the strength of a college's academic programs in deciding where to attend.  These are all part of the competitive market to attract student-athletes whose athletic labor can result in many benefits for a college, including economic gain.

92.     Schools spend significant sums and time recruiting highly skilled Division I athletes.  For example, USA Today reported that teams that spend money on recruiting make it to the NCAA Division I basketball tournament, noting that "[r]ecruiting is the lifeblood of college sports and a USA TODAY Sports analysis of 214 public schools found a correlation between schools that spend big on recruiting and schools that had success making the NCAA tournament from 2010 to 2014."[20]  Thus, "[a]mong the eight schools that made the tournament all five years,

---

[20] http://www.usatoday.com/story/sports/ncaab/2015/03/17/mens-basketball-recruiting-kansas-kentucky-louisville/24911927/ (last visited November 10, 2016).

the average five-year spending was $1.2 million and the average annual spending was $231,000." Considering that NCAA rules limit schools to Division I schools 13 basketball scholarships, with an even smaller number recruited as freshman, the money spent recruiting each player is significant.

93.     Institutions have also begun to recruit Division I athletes earlier and earlier in their careers. Recent reports have detailed college scholarships being offered to kids as young as 14 years old – before they even begin high school. Examples of costs undertaken by NCAA member institutions to gain access to young athletes and their families include: travel expenses, letters, phone calls, on-campus visits, and the use of recruiting services.

94.     The NCAA prohibits its member institutions from simply paying student-athletes salaries. Instead, students with athletic ability often are given Division I basketball scholarships that may sometimes equal the yearly cost of their education. In effect, the student-athlete uses his or her athletic abilities on behalf of the NCAA member institution in exchange for the cost of an athletic and academic education, room, and board. NCAA member institutions pay for these goods and services for student-athletes because student-athletes bring substantial collateral benefits to the school in the form of: (a) enhanced publicity and recruiting, which increases overall tuition revenue, (b) increased alumni donations, and (c) millions of dollars in gate receipts and licensing revenue.

## VI.     THE NCAA AND MEMBER SCHOOLS UNLAWFULLY AGREED TO RESTRAIN TRADE OR COMMERCE THROUGH ANTICOMPETITIVE RESTRICTIONS ON DIVISION I BASKETBALL PLAYERS' ABILITY TO TRANSFER

95.     The NCAA is an association of member institutions that compete against each other to attract revenues, fans, and athletes. It operates as a cartel to control nearly all aspects of college basketball.

96.     The specific practices challenged relate to the NCAA's transfer rules that prohibit a Division I basketball player from transferring to another NCAA Division I school without loss of athletic eligibility for a period of time.

97.     The restrictions outlined below represent unlawful agreements not to compete in terms of price or output and constitute a naked restraint of trade and commerce.

98.     The restrictions outlined below are inconsistent with the Sherman Act's command that price and supply be responsive to consumer preference.

99.     The NCAA's rules provide that if a student-athlete at a four-year Division I institution wishes to transfer to a different four-year Division I institution, he must sit out from intercollegiate competition for one academic year while the clock on his five-year window of eligibility continues to run.  NCAA Bylaw 14.5.5.1 states:  "**General Rule.** A transfer student from a four-year institution shall not be eligible for intercollegiate competition at a member institution until the student has fulfilled a residence requirement of one full academic year (two full semesters or three full quarters) at the certifying institution. (*Revised: 1/10/91 effective 8/1/91, 4/14/10*)."

100.     Certain limited exceptions exist to the year-in-residence requirement, including a so-called one-time transfer exception found in NCAA Bylaw 15.5.5.2.10.  That exception, though available to most athletes participating in most Division I sports, however, is not available to student-athletes in baseball, basketball, FBS football or men's ice hockey.[21]  Nor

---

[21] The limited exception is available to a Division I football player if the player is transferring from an FBS school to an FCS school and has two or more seasons of competition remaining, or the player is transferring from an FCS school that offers athletically-related financial aid in football to an FCS school that does not.

may a student-athlete be granted a one-time transfer exception unless the school from which he

is transferring consents to it in writing. *See* NCAA Bylaw 14.5.5.2.10.

101.    A waiver process is available to Division I basketball players and other student-

athletes not eligible for the one-time transfer exception, pursuant to which students who transfer

due to difficult personal or family circumstances may be provided with an additional year to

complete their eligibility.

102.    Prior to the 2015-16 academic year, these student-athletes could seek a waiver to

play immediately after transfer. But even if they met the stringent requirements for eligibility,

the procedure required extensive documentation and was criticized for its inconsistent approval

process.

103.    Numerous college sports commentators have criticized the byzantine nature of the

transfer rules. The sheer complexity of them serve as an impediment and barrier to players'

consideration of transferring schools, further entrenching the NCAA's anticompetitive effects in

the relevant market. For example, in 2013, ESPN.com's Eamonn Brennan wrote an article titled

"Want to Understand Transfer Rules? Give Up."[22] He wrote: "Transfers seem straightforward.

A player leaves one school and attends another, and has to sit out one year before he can play for

his new team. Simple, right? Wrong: Even that seemingly structured rule is beset by a score of

academic timeline requirements and bureaucratic processes." Mr. Brennan described those

requirements as follows:

> A player must receive a written permission-to-contact letter from
> his current coach. He must have spent a full year in "academic
> residence" – i.e., attending classes as a full-time, 12-credit-hours-
> or-insert-your-school's-equivalency student – before he is eligible

---

[22] http://espn.go.com/blog/collegebasketballnation/post/_/id/87697/trying-to-understand-transfer-rules-give-up (last visited November 10, 2016).

> to get back on the court at his new school. There are "4-4"
> transfers and "2-4" transfers and different rules therein; there are
> issues involving full, partial, or non-qualifying academic status;
> and there are waivers and appeals you can make based on specific
> circumstances that can change the preexisting requirements, just
> like that.

104.    The NCAA each year publishes a document titled "Transfer 101" which purports

to be a guide to help players understand the transfer process.  It in fact is a 30-page, single-

spaced document of which Mr. Brennan writes:  "Ostensibly, this document was created to make

the rules easy to understand and apply. It is filled with handy little case studies; it even has a

glossary of important terms. And if you can read past the third page without help from

prescription ADHD medication, well, I'd love to shake your hand. This stuff is *brutal*."

105.    In 2014, the NCAA eliminated the ability of Division I basketball players to apply

for a waiver to play immediately.  Under the new rule, transferring Division I basketball players

who would have been eligible for such a waiver will instead receive an extra year of eligibility to

play.  With the change in the rule, only the small percentage of Division I basketball players who

fulfill the requirements for the one-time transfer exception (or other enumerated exceptions in

the NCAA rules) and manage to secure permission from their original schools can play

immediately upon transfer.  All other transferring players are forced to sit out from competition

for a year while the clock on their limited window of eligibility continues to run.

106.    The year-in-residence requirement functions as a penalty imposed upon Division I

basketball players for switching schools.  Without the ability to play immediately, transferring

student-athletes are less attractive prospects and therefore less likely to secure athletics grants-in-

aid from their new schools.  The inability to receive an athletics grant-in-aid is particularly

egregious in the case of student-athletes who are forced to transfer because of the loss of an

athletics grant-in-aid at their original school or who are unable to transfer and receive less aid than their athletics grant-in-aid. Those without any other financial means available to them may be forced to give up their dreams of competition at the highest levels and instead transfer to a Division II school, or they may have to drop out of school entirely. Thus, as a result of the year-in-residence requirement, class members receive lower amounts of athletics-related financial assistance and other direct compensation than they would receive if class members were permitted to transfer without this limitation.

107.    But for this restraint, greater movement among Division I basketball players would inevitably occur. Players would seek out the team they most value, whether because of more playing time, a better relationship with the coaching staff, a change in the coaching staff that recruited the player, a better academic fit, or the availability of an athletics grant-in-aid on more favorable terms. Teams, in turn, would also seek out the players they most value. Free player movement would thus result in an optimal and most efficient matching of schools and players.

108.    Through the year-in-residence requirement, the NCAA and its members have thus contracted, combined, and conspired to restrict the movement of players between schools in the relevant market, as well as remove some players from the market altogether.

109.    Through the year-in-residence requirement, the NCAA and its members have further contracted, combined, and conspired to fix, depress, or stabilize the amount, terms, and conditions of athletics-based financial assistance to class members in the relevant market.

110.    The NCAA cannot justify its conduct as necessary to preserve education or amateurism. The NCAA has claimed that the year-in-residence requirement exists to "help student-athletes adjust to their new school" and "help[] offset th[e] dynamic" of poor academic

- 32 -

performance by transferring student-athletes over time.[23]   The NCAA also currently states on its website that "[i]n most cases, you may not compete for one year after transferring from a four-year college to another four-year college. This year is an opportunity to adjust to your new school and focus on your studies rather than sports."[24]

111.    But Division I basketball players are ineligible for a one-time exception to the year-in-residence requirement regardless of academic performance, even though the NCAA admits that "student-athletes who transfer with at least a 2.6 grade-point average have the same likelihood of academic success as a student-athlete who remains at his or her original institution."[25]

112.    Moreover, it has been decades since the NCAA maintained a rule making freshmen ineligible for athletic competition.  Freshmen are less equipped for college academics than are transfer students, who have experienced some college academics, perhaps several years.  And yet freshmen are immediately eligible to play, but transferring players are not.  Similarly, transfers from junior colleges are not required to sit out a year, having had no exposure to a four-year university's more rigorous academic demands.

113.    The NCAA's proffered academic motivations for the year-in-residence requirement are instead a pretext for the true economic motivations behind the rule.  Such motivations are seen most clearly via the one-time transfer exception, which is not available to the vast majority of Division I football players, as well as to Division I basketball and baseball

---

[23] NCAA, *Get the facts about transfers*, May 30, 2012, http://www.ncaa.org/about/resources/media-center/news/get-facts-about-transfers (last visited November 3, 2015).

[24] NCAA, Want to transfer?, http://www.ncaa.org/student-athletes/current/want-transfer (last visited November 3, 2015) (see "When Can I Compete?" questionnaire text).

[25] NCAA, *Get the facts about transfers*, May 30, 2012.

players and men's ice hockey players.  The NCAA claims that these sports are "historically academically underperforming,"[26] but as stated above, players in these sports are ineligible for the one-time transfer exception regardless of academic performance.  Rather, these sports also happen to be the highest-revenue sports.  The transfer rules at issue further NCAA members' economic interests in maintaining athletic programs while minimizing financial expenditures related to athletes as well as minimizing competition for student-athletes.  The transfer rules allow schools to lock in players for significant periods while minimizing administrative costs related to player movement, including recruiting and retention expenditures.

114.    Defendants' restraint is also further at odds with their often-professed legal defense of "competitive balance."  For example, the restraint preserves the hegemony of the top "Power 5" conferences, the most powerful members of the NCAA, who are able to recruit the most highly coveted high school prospects in the country.  By locking in those players, the transfer rules prevent player movement to less-powerful schools and conferences.  Thus, a player may languish at a Power 5 conference school, unable to obtain the playing time promised in the recruiting process, instead of flourishing and developing at a smaller school, to the benefit of the player and fans alike.  Such circumstances would severely threaten the perception of the Power 5 conferences as the ultimate and best destination for high school players.

115.    Defendants' restraint in suit, severely limiting player choice and mobility, is designed simply to further subjugate the rights of college players.  The restraint is at odds with the interests of fans of NCAA basketball, as it limits and restrains the availability of players to schools for which the players may be a better athletic fit, and for which the players may help produce a better product for fans.

---

[26] *Id.*

116.     The restraints on player movement are in stark contrast to the increasing frequency with which head coaches, assistant coaches, and athletic directors switch schools in search of higher paydays.  There are no such limitations on their movement, and many such circumstances have been heavily publicized.

117.     Numerous commentators and participants in the college sports industry have illustrated, sometimes very bluntly, the lack of any legitimate justification for the NCAA's transfer prohibition rules.  For example, on April 21, 2015, CBS Sports.com's Gary Parrish wrote in regards to the rule as applied to basketball players that "The point I'd rather make today is one I think we can all agree on, and that's how there's a pretty terrible unintended consequence to the NCAA no longer allowing waivers for transfers to play immediately, and that pretty terrible unintended consequence is this: Players who are run off by their coaches are now basically screwed."  Parrish continued:  "'It's wrong,' said one college coach who requested anonymity because he didn't want to speak out publicly against policy. 'You're telling me I can sign a kid, keep him for a year or two, decide I misevaluated him and pull his scholarship, and then that kid has to sit a year no matter what? That's [expletive] up, man. That's just [expletive] up.'"

118.     The NCAA also justifies the restraints on the grounds the sports subject to the restriction are "historically academically underperforming."  In reality the NCAA allows students in these sports to enroll with GPA and test scores that underperform other sports from the outset.  The restrictions are in fact tied to the highest revenue sports so that coaches in these sports have more control over the product.

010542-13  907319 V1

119.    Further, the rule allows coaches unfettered discretion simply if the coach feels that "If I can't have you nobody can."  The unreasonableness of the restraint is thus untethered to any purported pre-competitive justification.

120.    Coaches can block a player's "permission to contact" for a number of dumb reasons—to prevent a former assistant coach from "poaching" talent, for one—or for no discernible reason at all.  A Wisconsin player, Jarrod Uthoff, asked Wisconsin coach Bo Ryan to transfer him.  Ryan refused permission for Uthoff to make contact with any school Wisconsin might play.  He also denied permission to contact Marquette, Iowa State, and Florida.  In the case of Jarrod Uthoff, Ryan clearly wanted to avoid a future match-up with his ex-player, lest he pass along the deepest, darkest secrets of the Badgers' playbook.  (For that reason, most Division I athletic conferences have rules that make it very difficult for an athlete to transfer to a conference rival.)  Michigan basketball coach John Beilein has admitted this reasoning openly, saying, "We don't want a young man to take our playbook and go to the next school. It just doesn't make sense."  Now, recall that the NCAA's stated purpose in having transfers sit out a year is to allow them to "adjust academically."  Football and basketball coaches' strategic, playbook-protecting blockades reveal that this is a lie—that the supposedly academic rationale behind transfer restrictions is a cover for purely athletic considerations.

121.    After a massive public outcry, Ryan and Wisconsin partially relented, granting Uthoff a release to any university outside the Big Ten.  In the end, the player defied his coach and enrolled at Iowa, foregoing a scholarship so he could go to a Big Ten school.  "We can afford to pay for my education for a year," Uthoff told ESPN.  In that regard, Uthoff is a lucky guy—a whole lot of college students don't have that kind of financial freedom.

122.     Oklahoma State quarterback Wes Lunt, decided he wanted to transfer after losing his starting position in the aftermath of a knee injury and a concussion.  Oklahoma State coach Mike Gundy told the press that Lunt was "leaving on good terms."  Gundy then proceeded to block him, without explanation, from transferring to nearly 40 different schools, including three of Lunt's preferred options.  Though Gundy eventually lifted those restrictions, the quarterback said in a recent interview that the damage had been done—that he'd lost contact with the schools Gundy had blocked, meaning he had no choice but to go elsewhere.

123.     To call Ryan a hypocrite would be an insult to hypocrisy.  In 1999, Ryan signed a five-year contract at Wisconsin–Milwaukee.  Two seasons into that deal, he left to take the head job at Wisconsin–Madison—a move that, according to UW–Milwaukee's athletic director, felt "like a divorce" to the players he cast aside.  In Madison, meanwhile, a guard named Ricky Bower decided that he wanted to pull a Ryan and leave Wisconsin for BYU.  Ryan was eligible to coach his new team right away.  Bower had to sit out a year before he could suit up again— you know, NCAA rules and all.

## VII.     CLASS ALLEGATIONS

124.     Plaintiff sues on his own behalf and the following two classes, including the following "Transfer Injunctive Relief Class" pursuant to Rule 23(a) and b(2):

> All individuals who, from November 10, 2012, to the present, have been a member of an NCAA Division I basketball team;

and the following "Transfer Core Issues Class" pursuant to Rule 23(a), (b)(2), and (c)(4):

> All individuals who, from November 10, 2012, to the present, have sought to transfer from one NCAA Division I basketball school to another NCAA Division I basketball school, and pursuant to NCAA transfer rules, were considered to be, or would have been considered to be, athletically ineligible to participate in NCAA Division I athletics for any period of time.

125.     Excluded from all proposed Classes are the employees of the NCAA and their member institutions, employees, class counsel and their employees, and the judicial officers and associated court staff assigned to this case.  Excluded from the proposed "Core Issues Class" are individuals whose athletics-related grants-in-aid were reduced, cancelled, or not renewed due to one of the reasons enumerated in Bylaw 15.3.4.2 of the NCAA Division I Manual.

126.     Members in the Classes are collectively referred to as "class members" or "the Class" unless otherwise specified.

127.     The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each class member can be identified by using Defendants' records.  Plaintiff is informed and believes that there are many thousands of Class members.

128.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

> a.  Whether the NCAA and its member institutions unlawfully contracted, combined, and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to restrict NCAA Division I basketball players' ability to transfer to other NCAA Division I basketball schools without being deemed athletically ineligible for a period of time;
>
> b.  The definition of the relevant market;
>
> c.  Whether the NCAA has any pro-competitive justification for its conduct;
>
> d.  Whether the pro-competitive effects of the conduct, if any, outweigh the clear injury to class members;

e. Whether class members have suffered antitrust injury; and

f. The nature and scope of injunctive relief necessary to restore a competitive market.

129. Plaintiff's claims are typical of the Class claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

130. Plaintiff will fairly and adequately protect the interests of the Class. He will vigorously pursue the claims and has no antagonistic conflicts. Plaintiff has retained counsel who are able and experienced class action litigators and are familiar with the NCAA.

131. Defendants have acted or refused to act on grounds that apply generally to the Class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. A class action is also appropriate because Defendants have acted and refuse to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

132. Questions of law or fact common to class members predominate over any questions affecting only individual members. Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims. It is not anticipated that there would be difficulties in managing this case as a class action.

## VIII.  CAUSES OF ACTION

**FIRST CAUSE OF ACTION (ASSERTED INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED)**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1**

133.    Plaintiff incorporates by reference the allegations in the above paragraphs as if
fully set forth herein.

134.    The NCAA and NCAA member institutions by and through their officers,
directors, employees, agents, or other representatives have entered into an unlawful agreement
combination and conspiracy in restraint of trade.

135.    Specifically, the NCAA and NCAA member institutions have unlawfully agreed
to restrain the ability of NCAA Division I basketball players to transfer to other Division I
basketball schools without loss of athletics eligibility.  These unlawful agreements have
unreasonably restrained competition among NCAA member institutions for student-athletes'
labor.

136.    Class members seeking to provide their athletic labor in exchange for in-kind
benefits, including grants in aid, have been deprived of the benefits of free and open competition.

137.    Class members' choice of which NCAA Division I member institution to attend
has been artificially restricted by the NCAA's restrictions on their ability to transfer without loss
of athletics eligibility.

138.    Defendant NCAA and its member institutions have undertaken this conduct in the
United States and its territories.

139.    Defendant NCAA's business activities and operations involve and affect the
interstate movement of students and the interstate flow of substantial funds (including, but not
limited to, tuition, room and board, and mandatory fees).

140.     As a direct result of the conduct of Defendant NCAA and its co-conspirators, class members have been injured.  Competition among NCAA member institutions has been unreasonably restrained, and as a result class members have been injured because their choices of schools to attend have been limited, or even eliminated.

141.     The conduct of the NCAA is continuing and will continue to impose antitrust injury on student-athletes unless injunctive relief is granted.

142.     In addition, injunctive relief is necessary to remedy the effects of the NCAA's past wrongful conduct.

## SECOND CAUSE OF ACTION (ASSERTED INDIVIDUALLY)

## BREACH OF CONTRACT

### (Applicable to Plaintiff's Claims Against Defendant Northwestern University)

143.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

144.     At all times relevant, Plaintiff had a valid and enforceable contract with Defendant Northwestern for a full athletics grant-in-aid during the period 2014-15 through the 2017-18 academic years (including tuition, fees, room, board, and books).  *See* Ex. 1 (Big Ten Tender of Financial Aid from Northwestern University and Plaintiff).

145.     At all times relevant, Plaintiff performed his obligations under the contract, including but not limited to: (1) fulfilling Defendant's admission requirements, (2) complying with institutional policies and rules, regulations, bylaws, and other legislation of Defendant Northwestern, the Big Ten Conference and Defendant NCAA, (3) maintaining his eligibility for intercollegiate competition, (4) not engaging in fraudulent misrepresentation of any information on an application, letter of intent, or financial aid agreement, (5) following (and not abusing)

team rules, whether as determined by his coach or by the athletic administration, (6) avoiding any misconduct, let alone serious misconduct, that would warrant a substantial disciplinary penalty, (5) avoiding criminal conduct and charges, (6) not voluntarily withdrawing from basketball at any time, (7) maintaining continuous enrollment at Northwestern, and (8) not receiving countable aid causing him and/or Northwestern to exceed NCAA financial aid limits.

146.    However, Northwestern breached the contract by cancelling Defendant's athletics grant-in-aid on or about May 4, 2016, when it announced that "the Department of Athletics and Recreation has not provided sufficient information for a removal of your athletics scholarship" but the school nevertheless chose "to administer the granting of the aid in a different manner than usual due to the unusual circumstances presented in this appeal."

147.    Plaintiff was injured by Northwestern's breach, having spent money that he would not have had to spend if he remained on the team and an athletics grant-in-aid.

### THIRD CAUSE OF ACTION (ASSERTED INDIVIDUALLY)
### PROMISSORY ESTOPPEL

**(Applicable to Plaintiff's Claims Against Defendant Northwestern University)**

148.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

149.    In offering Plaintiff athletics grant-in-aid for the 2014-15 through 2017-18 academic years, Defendant Northwestern unambiguously promised that his athletics grant-in-aid would not be reduced or cancelled: (1) on the basis of his athletics ability, performance, or contribution to the team's success, (2) because of an injury, illness, or physical or mental condition (except as permitted by NCAA Bylaw 15.3.4.2), or (3) for any other athletics reason.

150.     Plaintiff relied on Defendant Northwestern's unambiguous promise, as evidenced by Plaintiff's enrollment in Northwestern and joining the school's basketball program.  In addition, Plaintiff relied on the fact that he would receive a fair hearing on Northwestern's efforts to revoke his athletic scholarship, preparing for and attending the hearing with the expectation that if he proved his case that the alleged timesheet alteration was false then he would still have his athletic scholarship.

151.     Northwestern expected and foresaw Plaintiff's reliance on its promise not to reduce or cancel Plaintiff's athletics grant-in-aid for the 2014-15 through 2017-18 academic years, including but not limited to as evidenced by the fact that Defendant utilized the offer of such aid in order to have Plaintiff join its basketball program over the numerous other institutions that recruited Plaintiff.

152.     Plaintiff relied on Defendant Northwestern's promise to his injury as Defendant cancelled Plaintiff's athletics grant-in-aid on May 4, 2016, having spent money that he would not have had to spend if he remained on the team with an athletics grant-in-aid.

### FOURTH CAUSE OF ACTION (ASSERTED INDIVIDUALLY)

### COMMON LAW FRAUD

**(Applicable to Plaintiff's Claims Against Defendant Northwestern University)**

153.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

154.     In April 2014, Defendant offered Plaintiff an athletics grant-in-aid for the 2014-15 through 2017-18 academic years.  In doing so, Defendant Northwestern unambiguously promised that Plaintiff's athletics grant-in-aid would not be reduced or cancelled: (1) on the basis of his athletics ability, performance, or contribution to the team's success, (2) because of an

injury, illness, or physical or mental condition (except as permitted by NCAA Bylaw 15.3.4.2), or (3) for any other athletics reason. In addition, Defendant represented that should the school attempt to revoke Plaintiff's athletic scholarship for any reason, he would be entitled to an appeal.Vass

155.    These representations were not merely opinions; rather, they were material, and made for the purpose of inducing Plaintiff to enroll at Northwestern beginning with the 2014-15 season and continuing through 2017-18.

156.    However, Defendant's statements that plaintiff would receive a multi-year athletic scholarship for the period of 2014-15 through 2017-18 along with a fair hearing were untrue.

157.    Defendant knew that its statements that it would provide Plaintiff with a multi-year athletic scholarship for the period of 2014-15 through 2017-18 were untrue or were made recklessly as to the statement's truth or falsity. To that end, unknown individuals within Defendant falsified Plaintiff's internship timesheets in an effort to create grounds for revoking Plaintiff's guaranteed athletic scholarship. And even though Northwestern found, after a hearing, that grounds for revoking Plaintiff's athletic scholarship did not exist, Defendant nevertheless revoked Plaintiff's athletic scholarship.

158.    To his detriment, Plaintiff relied on Defendant's representations.

159.    Plaintiff's reliance on the fact that he would receive a multi-year athletic scholarship for the period of 2014-15 through 2017-18 along with a fair hearing led to Plaintiff's injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.     Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Plaintiff as the Class Representative and his counsel of record as Class Counsel;

B.     A declaration by this Court that Defendants' conduct constituted a conspiracy and that Defendants are liable for the conduct of or damage inflicted by any other co-conspirator;

C.     A declaration that the NCAA's restrictions on players' ability to transfer without loss of athletic eligibility is unlawful;

D.     Actual damages, trebled damages, punitive damages, and such other relief as provided by the statutes and causes of action cited herein;

E.     Pre-judgment and post-judgment interest on such monetary relief;

F.     Equitable relief enjoining Defendants from restricting players' ability to transfer without loss of athletic eligibility;

G.     The costs of bringing this suit, including reasonable attorneys' fees; and

H.     All other relief to which Plaintiff and class members may be entitled at law or in equity.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues triable of right by jury.

Dated: November 14, 2016    Respectfully submitted,


         By: **/s/ _Steve W. Berman_**
           Steve W. Berman
         HAGENS BERMAN SOBOL SHAPIRO LLP
         1918 Eighth Avenue, Suite 3300
         Seattle, WA  98101
         Telephone: (206) 623-7292
         Facsimile:  (206) 623-0594
         steve@hbsslaw.com

         Elizabeth A. Fegan
         Daniel J. Kurowski
         HAGENS BERMAN SOBOL SHAPIRO LLP
         455 N. Cityfront Plaza Drive, Suite 2410
         Chicago, IL 60611
         Telephone: (708) 628-4960
         Facsimile:  (708) 628-4950
         beth@hbsslaw.com
         dank@hbsslaw.com

         *Attorneys for Plaintiff*

- 46 -